# Illinois Official Reports

## Appellate Court

---

### *People v. Kuehner*, 2014 IL App (4th) 120901

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANNY KUEHNER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0901 |
| Filed | April 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The motion of defendant's postconviction counsel to withdraw was affirmed under *Greer* where the record showed that counsel's duties under Supreme Court Rule 651(c) were satisfied and that the claims made in defendant's petition were frivolous and patently without merit; furthermore, the denial of defendant's petition alleging that his trial counsel provided ineffective assistance in connection with his guilty plea and that his appellate counsel failed to properly argue the issue was upheld, in view of defendant's contradictory comments at the hearing on his guilty plea that no promises or agreements existed with regard to his possible sentence. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 05-CF-724; the Hon. Patrick W. Kelley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, of State Appellate Defender's Office, of Springfield, and Alan D. Goldberg and Kieran M. Wiberg (argued), both of State Appellate Defender's Office, of Chicago, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Kathy Shepard (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Turner and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1        In October 2005, defendant, Danny Kuehner, entered an open plea of guilty to attempt (first degree murder) (720 ILCS 5/8-4, 9-1(a)(1) (West 2004)) and home invasion (720 ILCS 5/12-11(a)(2) (West 2004)). In February 2007, defendant filed a motion to withdraw his guilty plea, alleging that his guilty plea was not knowing and voluntary because of his attorney's deficient advice and representation. The trial court denied that motion and sentenced defendant to two consecutive terms of 17½ years in prison.

¶ 2        In May 2009, defendant *pro se* filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-8 (West 2008)), alleging that he was denied his right to the effective assistance of trial and appellate counsel. The trial court advanced defendant's petition to the second stage of postconviction proceedings and appointed counsel to represent defendant. In August 2009, the State filed a motion to dismiss defendant's petition. In July 2012, postconviction counsel filed a motion to withdraw as counsel and a brief in support of the motion, alleging that after a "thorough review of the case file," she "could find no flaws in the process that [defendant] received." Following a September 2012 hearing, the court granted postconviction counsel's motion to withdraw and dismissed defendant's petition.

¶ 3        Defendant appeals, arguing that the trial court erred by granting postconviction counsel's motion to withdraw. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        The following facts were gleaned from the record of the underlying trial court proceedings, as well as the record of the postconviction proceedings. We limit our recitation of the facts to those relevant to the issues presented in this appeal.

¶ 6                              A. The State's Charges and Defendant's Guilty Plea

¶ 7          In June 2005, the State charged defendant with (1) attempt (first degree murder); (2) home invasion; (3) residential burglary (720 ILCS 5/19-3(a) (West 2004)); (4) robbery of a senior citizen (720 ILCS 5/18-1(a) (West 2004)); (5) aggravated battery of a senior citizen (720 ILCS 5/12-4.6(a) (West 2004)); and (6) criminal damage to property (720 ILCS 5/21-1(1)(a) (West 2004)).

¶ 8          At a September 2005 hearing, defendant appeared with retained counsel, John Sharp, to enter a negotiated guilty plea to attempt (first degree murder) and home invasion. The State agreed to dismiss the remaining charges in exchange for defendant's guilty plea, but it did not agree to recommend a sentence. During the trial court's admonishments, defendant informed the court that he had been diagnosed with depression and had entered a mental institution because he was going to hurt himself. Defendant left the mental-health institution on the day he was arrested for the charged offenses. In response to the court's questions, defendant stated that his depression was "under control," he was taking trazodone for sleep and depression, and he understood what he was "about to do" by entering a guilty plea. The State requested that Sharp state for the record that he had no *bona fide* doubt of defendant's fitness. Sharp responded by stating that he had spoken with defendant several times for over an hour each time, and defendant had always been responsive and appropriate.

¶ 9          The State provided the factual basis for the guilty plea, stating that on the morning of June 3, 2005, relatives of 98-year-old Margaret Geldrich found her lying unconscious in a pool of blood on her kitchen floor. Geldrich was taken to the hospital with broken bones on each side of her face, a fractured arm, a dislocated shoulder, and substantial bleeding from her head and face. Later that same day, police arrested defendant, who was then 17 years old, and Bruce Lloyd, who was then 18 years old, in connection with an unrelated armed robbery of a cab driver. Defendant and Lloyd were found in possession of jewelry belonging to Geldrich.

¶ 10          Interviews of defendant and Lloyd led police to arrest Chris Howell, a juvenile, who confessed that he, defendant, and Lloyd agreed to burglarize Geldrich's home because Geldrich was particularly vulnerable due to her poor hearing and vision. Howell told investigators that he stood outside of Geldrich's home while defendant and Lloyd broke in through a window. After defendant and Lloyd entered Geldrich's home, Howell went next door into his own home. Approximately 35 minutes later, defendant came to Howell's home and told him that Lloyd was still inside with Geldrich, who was screaming. Howell and defendant told investigators that Lloyd attacked Geldrich. Lloyd told investigators that he entered the home with defendant, but defendant attacked Geldrich, and it was Howell's idea to commit the burglary. Geldrich told investigators that two men were inside her home, and she pretended to be dead so that the beating would stop. Defendant stipulated to the factual basis.

¶ 11          The trial court then concluded its admonishments of defendant, who stated that his guilty plea was the product of his own free will, he had not been threatened or promised anything in exchange for his plea, and he understood the nature of the charges against him and the possible penalties. The court then accepted defendant's guilty plea and entered a judgment of conviction against him.

¶ 12                    B. Defendant's Motion To Withdraw His Guilty Plea

¶ 13        In November 2006, defendant sent a handwritten letter to the trial court, asserting that he was innocent and that his guilty plea was the product of coercion by Sharp. Defendant claimed that he received inadequate representation and he wished to withdraw his guilty plea. The court appointed a public defender to represent defendant.

¶ 14        In February 2007, the public defender moved to withdraw as counsel. At a hearing on that motion, defendant explained that his public defender had called him names. The court granted the public defender's motion to withdraw, and attorney Shaun Liles entered his appearance on defendant's behalf.

¶ 15        At a February 2007 hearing on defendant's motion to withdraw his guilty plea, defendant testified that Sharp told him he would receive between 12 and 20 years in prison if he pleaded guilty. Defendant acknowledged, however, that the trial court admonished him that (1) he was eligible for between 12 and 120 years in prison and (2) no guarantees existed as to his sentence. Defendant explained that he pleaded guilty because "Sharp said he felt like" defendant would face "a lot more time" if he took the case to a jury trial.

¶ 16        Defendant testified that he met with Sharp between 5 and 10 times before entering his guilty plea. Sharp never asked defendant about his psychological condition. Defendant "tried to show [Sharp] paperwork and stuff" relating to his psychological condition, but Sharp told him that it was not "a big deal." Defendant informed Sharp that he admitted himself to a psychiatric ward and that he was arrested on the day of his release. Sharp never explained to defendant that his mental state might be relevant to his responsibility for the charged offenses.

¶ 17        On cross-examination, defendant testified that he entered his guilty plea hoping that his cooperation with the State would secure him a lesser sentence than Lloyd. Defendant provided lengthy, detailed testimony at Howell's trial regarding the entire day's events leading up to, and including, the crimes committed inside Geldrich's home. Defendant admitted that on the day he committed the crimes at issue, he (1) knew the difference between right and wrong, (2) knew that it was a crime to enter Geldrich's home and steal from her, (3) was able to conform his behavior to the requirements of the law, and (4) chose to commit the crimes anyway.

¶ 18        Sharp testified that defendant pleaded guilty following his discussions with Sharp regarding the police reports and the evidence the State intended to present at trial. Prior to his guilty plea, defendant told Sharp that he checked himself into a psychiatric ward due to anger issues and was released on the day of the crimes at issue. Nothing indicated to Sharp that defendant was not able to understand the discussions regarding his case. Sharp never requested consent from defendant to obtain his medical records. Based upon his multiple interactions with defendant, Sharp was satisfied that defendant was competent to proceed with the guilty plea. Sharp admitted that he had no training in psychology or psychiatry.

¶ 19        On cross-examination by the State, Sharp testified that he was licensed to practice law in 1986 and, since 1988, he had been engaged in private practice, specializing exclusively in traffic and criminal cases. Sharp was familiar with the legal definitions of sanity and fitness. During the course of his law practice, Sharp had previously filed motions in other cases for court-ordered psychiatric examinations to determine the fitness of his clients. Based upon his multiple interactions with defendant, Sharp noticed nothing to indicate that he should request a psychiatric examination of defendant. Sharp testified that although defendant "refused to

accept how he could be accountable" for Lloyd's actions, defendant understood the legal principle of accountability, as explained to him by Sharp. Sharp was never concerned that defendant lacked the ability to conform his behavior to the law.

¶ 20    Sharp testified that he never threatened or coerced defendant into pleading guilty. Instead, Sharp gave defendant his best professional advice, which included informing defendant (1) of the strengths and weaknesses of the State's evidence against him; (2) that defendant was facing between 12 and 120 years in prison; and (3) that based upon defendant's cooperation with the State and his lack of prior adult convictions, Sharp hoped to get defendant a sentence of between 12 and 20 years in prison. Sharp never guaranteed defendant would receive between 12 and 20 years in prison. Sharp testified that the State had "overwhelming" evidence against defendant, particularly (1) defendant's possession of Geldrich's jewelry at the time of his arrest; (2) statements made by Lloyd and Howell to the police implicating themselves and defendant in the crimes against Geldrich; and (3) defendant's own self-incriminating statements, which he delivered shortly after his arrest, unsolicited, after summoning police investigators to his jail cell. Sharp believed that, based upon the overwhelming evidence against defendant, his best strategy was to "attempt damage control."

¶ 21    Through plea negotiations with the State, Sharp was able to obtain the dismissal of four of the six charges against defendant relating to the incident at Geldrich's home, as well as the dismissal of armed-robbery charges against defendant in connection with the robbery of the cab driver committed by defendant and Lloyd hours after their invasion of Geldrich's home.

¶ 22    Relying exclusively on *Brown v. Sternes*, 304 F.3d 677 (7th Cir. 2002), defendant argued that Sharp rendered ineffective assistance prior to the entry of the guilty plea by failing to further investigate defendant's mental illness. Specifically, defendant asserted that Sharp's failure to so investigate prejudiced him because it prevented defendant from (1) receiving a competency hearing, (2) raising an insanity defense, and (3) arguing that he should receive a more lenient sentence in light of his mental illness. (As to this third point, the trial court reminded defendant that the case had yet to proceed to sentencing.) Defendant did not argue that his guilty plea was the product of coercion or misrepresentation by Sharp.

¶ 23    The State argued that, given Sharp's experience as a criminal defense attorney and his multiple interactions with defendant, his decision not to request a psychiatric examination was reasonable. Further, the State contended that the evidence showed that Sharp made no material misrepresentations to defendant regarding his possible sentence or the State's evidence against him.

¶ 24    Following the presentation of evidence and argument, the trial court denied defendant's motion to withdraw his guilty plea, finding that nothing in the record indicated that defendant's guilty plea was not entered knowingly, voluntarily, and without coercion. The court noted that Sharp's representation of defendant was "exemplary," and, based upon the evidence presented, Sharp was not required to further investigate defendant's mental health.

¶ 25                                  C. Defendant's Sentencing Hearing

¶ 26     Following denial of defendant's motion to withdraw his guilty plea, the trial court proceeded immediately to a sentencing hearing, at which the State presented the following pertinent evidence.

¶ 27     Detective Ryan Simms testified that he spoke with defendant three or four separate times following the attack on Geldrich. Each time, defendant described his involvement in the crimes with increasing detail. On the first such occasion, defendant summoned Simms to the Sangamon County jail, where defendant was in custody for the armed robbery of the cab driver. Defendant told Simms that when he was inside Geldrich's home, he thought Geldrich might be dead, so he touched her to determine whether she was breathing. Defendant also told Simms that after leaving Geldrich's home, he and Lloyd attempted to sell Geldrich's jewelry to Lloyd's acquaintance, Grover Brinkley, in exchange for crack cocaine. Brinkley rejected the proposed transaction. Simms interviewed Brinkley, who corroborated that story.

¶ 28     Simms also interviewed Craig Lynne, an inmate in the Department of Corrections, regarding statements that defendant made to Lynne at the Sangamon County jail. Defendant told Lynne that he swung Geldrich by the arm, threw her around, and beat her. Another of defendant's former cell mates at the Sangamon County jail, whom Simms referred to as "Tetley," also told Simms that defendant spoke with him about his participation in Geldrich's beating. Both Lynne and Tetley were in the custody of the Department of Corrections when they spoke to Simms regarding defendant's statements. Neither man was facing pending charges, nor did they ask for anything in exchange for their statements.

¶ 29     On cross-examination, Simms testified that investigators found blood on the clothing of one of the suspects (Simms did not identify which suspect's clothing contained blood). However, investigators subsequently determined that the blood did not belong to Geldrich.

¶ 30     Following the presentation of evidence and argument, the trial court sentenced defendant as stated.

¶ 31                         D. Defendant's Direct Appeal

¶ 32     On direct appeal, defendant argued only that the trial court abused its discretion at sentencing. This court affirmed. *People v. Kuehner*, No. 4-07-0426 (May 7, 2008) (unpublished order under Supreme Court Rule 23).

¶ 33                         E. Postconviction Proceedings

¶ 34     In May 2009, defendant *pro se* filed a petition for postconviction relief in which he alleged that Sharp rendered ineffective assistance of counsel by (1) failing to investigate defendant's mental-health issues and (2) telling defendant, his mother, and his aunt "lies" in order to "force a guilty plea upon [defendant]." Additionally, defendant alleged that his appellate counsel was ineffective for failing to argue Sharp's ineffectiveness on direct appeal. Defendant attached to his petition affidavits completed by his aunt, Pam Meyer, and his mother, Julie Meyer.

¶ 35                         1. *Pam's Affidavit*

¶ 36     Pam stated in her affidavit that she discussed defendant's mental-health history with Sharp, who told her that it would be of no use in court. Pam asserted that she thought defendant's case would go to trial, but she "was shocked when all of the sudden Sharp told me we needed to

convince [defendant] to take a deal the State was offering and the best he could do would be to get him between 12 and 20 years." Pam further stated, as follows:

"Sharp told us about some evidence [the State] had against [defendant], including [defendant's] T-shirt with blood on it, saying it was probably the victim's. It ended up being someone else's blood and had nothing to do with the case. We were told and shown only bits and pieces of [defendant's] discovery.

I believe we made a mistake in convincing [defendant] to plead guilty without having all the facts and seeing all the evidence. We felt we had no other choice. We basically just helped scare [defendant] into signing the deal along with Mr. Sharp threatening to pass the deal onto his co-defendant if [defendant] did not sign it immediately."

Pam claimed that defendant "never wanted to sign the plea agreement and said so multiple times before, immediately after, and to this day."

¶ 37                                   2. *Julie's Affidavit*

¶ 38        Julie asserted in her affidavit that Sharp told her that if she did not convince defendant to plead guilty, defendant would spend the rest of his life in prison. If defendant pleaded guilty, Sharp told Julie, defendant would receive between 12 and 20 years in prison. Julie further stated, as follows:

"[Sharp] made it seem as if it did not even matter that [defendant] said he is not guilty of this. He told me he attempted to get [defendant] to plead guilty and [defendant] would not do it. He told my sister, Pam Meyer, and I that he was not paid enough money to take [defendant's] case to trial so we would have to find a way to 'convince' [defendant] he had to plead guilty since [defendant] refused to do it when Sharp told him to. I was very scared when Sharp told me there was evidence that would get [defendant] put in prison for life. I found out later that more evidence existed and Sharp told me lies, but at that time I was scared for my son's life so I thought I had to get him to plead guilty. [Defendant] was not aware of the evidence. He only knew what my sister, Pam Meyer, and I told him. Sometime in October of 2005, [defendant] called me and he told me over and over again that he was not guilty of the charges they wanted him to plead guilty to, but I explained he had to due to the reasons Sharp said and I cried and begged him to plead guilty because I thought if he didn't he would go to prison for life. This is what Sharp told me and I knew I was probably the only person [whom defendant] would listen to. I know now that all I did was give [defendant] false information that a professional gave me. [Defendant] did not plead guilty because he is guilty, he plead [*sic*] guilty because his lawyer told me to give him information that I later found out was false, he was mentally ill, his attorney, his aunt, and I all told him he had to plead guilty."

¶ 39                          3. *The Trial Court's First-Stage Ruling*

¶ 40        In July 2009, the trial court entered a docket entry stating, "the court finds the petition is not frivolous or patently without merit, [and] therefore orders that it be docketed for further consideration." The court appointed attorney Sara Mayo as postconviction counsel.

#### 4. *The State's Motion To Dismiss Defendant's Petition*

In August 2009, the State filed a motion to dismiss defendant's postconviction petition, arguing that the petition (1) alleged no specific facts, but merely stated conclusions; (2) stated no grounds that, if established, would constitute a substantial deprivation of defendant's constitutional rights; (3) asserted claims of error that were forfeited because they were not argued on direct appeal; and (4) contained claims of ineffective assistance of counsel that were not supported by the record.

#### 5. *Mayo's Motion To Withdraw*

In July 2012, citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987), Mayo filed a motion to withdraw as counsel and a brief in support of the motion. In her motion, Mayo stated, in pertinent part, as follows:

> "After careful review of the entire record, the controlling law at the time of the conviction and sentence, as well as the immediately preceding controlling law, and after conducting a thorough review of the issues raised by [defendant], court-appointed counsel herein has concluded that the issues raised by [defendant] are without merit and unsupportable as a matter of law."

In her brief in support of the motion to withdraw, Mayo recited the facts and procedural history of defendant's case. Based upon the transcripts of the hearings on defendant's guilty plea and his motion to withdraw his guilty plea, Mayo argued that Sharp did not render ineffective assistance by failing to further investigate defendant's mental health. Mayo contended that the record offered no legitimate basis from which to argue that defendant was not competent to plead guilty, or that he had a valid insanity defense.

Mayo further noted that defendant requested her to investigate the disparity between his sentence and the sentence received by Howell. Mayo asserted in her brief that the disparity between defendant's sentence and Howell's sentence was attributable to the facts that (1) Howell was tried as a juvenile and defendant was convicted as an adult, and (2) the trial court noted at sentencing that defendant was more culpable than Howell. Mayo did not specifically address defendant's claim relating to Sharp's alleged lies to defendant, Pam, and Julie.

Mayo concluded her brief in support of her motion to withdraw, as follows:

> "After a thorough review of [defendant's] case file and the relevant law, the undersigned counsel could find no flaws in the process that [defendant] received. The undersigned could find no errors committed by any of [defendant's] counsel which rose to the level of ineffectiveness. For the foregoing reasons, the undersigned filed her motion for leave to withdraw pursuant to *Pennsylvania v. Finley*."

#### 6. *Defendant's Motion To Strike Mayo's Motion To Withdraw*

Defendant *pro se* filed a motion to strike Mayo's motion to withdraw, in which he stated, in pertinent part, as follows:

> "[Defendant] has discussed his former counsel Sharp's ineffectiveness with postconviction counsel Mayo on several occasions. [Defendant] has stated to Mayo that Sharp lied to him, falsified evidence, refused to investigate his mental history, and sent him a letter attempting to rush him and coerce him into accepting a plea of guilty."

¶ 50    In a 16-page handwritten brief in support of his motion to strike Mayo's motion to withdraw, defendant essentially argued that (1) Sharp was ineffective for failing to further investigate defendant's mental-health history, (2) defendant's sentence was unfair in light of Howell's lesser sentence, and (3) Mayo was withholding from the trial court an affidavit from Howell that proved defendant was innocent. In Howell's affidavit, which defendant attached to his motion to strike Mayo's motion to withdraw, Howell generally asserted that defendant had a lesser involvement in the crimes against Geldrich than Howell's original statements to investigators had suggested. Defendant's brief was devoid of any argument pertaining to Sharp's alleged lies to defendant, Pam, or Julie.

¶ 51                           7. *The Hearing on Mayo's Motion To Withdraw*

¶ 52    At a September 2012 hearing on Mayo's motion to withdraw, defendant argued that Mayo should have used Howell's affidavit to secure a lesser sentence for defendant. Defendant's only argument at the hearing pertained to the disparity between his sentence and Howell's sentence. In support of her motion to withdraw, Mayo argued that she did not make use of Howell's affidavit because whatever changes it made to Howell's original story were not significant enough to warrant resentencing.

¶ 53    At the conclusion of the hearing, the trial court granted both Mayo's motion to withdraw and the State's motion to dismiss defendant's postconviction petition.

¶ 54    This appeal followed.

¶ 55                                      II. ANALYSIS

¶ 56    Defendant argues that the trial court erred by granting Mayo's motion to withdraw. Defendant attacks the court's judgment on two grounds. First, defendant contends that Mayo's motion to withdraw was insufficient under *People v. Greer*, 212 Ill. 2d 192, 817 N.E.2d 511 (2004), because Mayo did not explain why *all* of defendant's claims were frivolous or patently without merit. Second, defendant asserts that the court's judgment cannot be affirmed under *Greer*'s "alternative" basis because the record does not demonstrate that (1) Mayo fulfilled all of her duties under Illinois Supreme Court Rule 651(c) (eff. Apr. 26, 2012) and (2) defendant's unaddressed claims are frivolous and patently without merit. Before turning to the merits, we first address defendant's misinterpretation of *Greer*.

¶ 57                         A. The Right to Counsel Under the Act

¶ 58    The Act provides for the appointment of counsel to an indigent defendant whose petition survives the first stage of postconviction proceedings, which occurs if the trial court does not dismiss the petition as frivolous or patently without merit within the first 90 days of filing. 725 ILCS 5/122-2.1, 122-4 (West 2008). Within the first 90 days of filing, the court can affirmatively docket the petition for second-stage proceedings or it can do nothing, which results in automatic docketing for second-stage proceedings once the 90 days have elapsed. 725 ILCS 5/122-2.1 (West 2008). At the second stage, once counsel is appointed for an indigent defendant, the Act entitles the defendant to only a "reasonable" level of assistance. *Greer*, 212 Ill. 2d at 204, 817 N.E.2d at 519 (citing *People v. McNeal*, 194 Ill. 2d 135, 142, 742 N.E.2d 269, 273 (2000)).

¶ 59 Rule 651(c) provides that the record in postconviction proceedings "shall contain a showing, which may be made by the certificate of [the defendant's] attorney, that the attorney has consulted with [the defendant] by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of [the defendant's] contentions." Ill. S. Ct. R. 651(c) (eff. Apr. 26, 2012).

¶ 60 **B. The *Greer* Holdings**

¶ 61 In *Greer*, the supreme court held that the Act does not "require appointed counsel to continue representation of a postconviction defendant after counsel determines that defendant's petition is frivolous and patently without merit." *Greer*, 212 Ill. 2d at 209, 817 N.E.2d at 522. Instead, postconviction counsel is *ethically prohibited* from arguing claims that are frivolous or patently without merit. *Id.* at 206, 817 N.E.2d at 520 (citing Ill. S. Ct. R. 137 (eff. Feb. 1, 1994)).

¶ 62 In *Greer*, the trial court appointed postconviction counsel after the defendant's petition was docketed for second-stage proceedings, which occurred by operation of statute because the court did not dismiss or advance the petition during the first 90 days after filing. *Id.* at 200, 817 N.E.2d at 516. Postconviction counsel filed a motion to withdraw on the grounds that he had reviewed the record, the transcripts of proceedings, the State's Attorney's files, and had interviewed "all relevant parties," including defendant, but could find "no basis on which to present any meritorious issue for review." (Internal quotation marks omitted.) *Id.* Counsel supported his motion to withdraw with a brief purporting to comply with *Anders v. California*, 386 U.S. 738 (1967). *Greer*, 212 Ill. 2d at 200, 817 N.E.2d at 516. The trial court granted postconviction counsel's motion to withdraw. *Id.*, 817 N.E.2d at 517.

¶ 63 The supreme court in *Greer* held that the trial court properly allowed postconviction counsel to withdraw. *Id.* at 212, 817 N.E.2d at 523. First, the court determined that the record revealed counsel had fulfilled his duties under Rule 651(c). *Id.* Second, the court agreed with counsel's position that, based upon the record, the defendant's postconviction claims were frivolous and patently without merit. *Id.* The court also stated that "an attorney moving to withdraw should make some effort to explain *why* defendant's claims are frivolous or patently without merit." (Emphasis in original.) *Id.* However, the court did not hold that such an explanation was a prerequisite for withdrawal of counsel. *Id.*

¶ 64 In *People v. Komes*, 2011 IL App (2d) 100014, ¶ 29, 954 N.E.2d 300, the Second District interpreted the *Greer* court's holding, as follows:

> "The *Greer* court said that a proper motion to withdraw should include an explanation of why *all* of the petitioner's claims are frivolous or patently without merit. It also held that a reviewing court can uphold the grant of such a motion despite its deficiency if the record shows that counsel complied with the requirements of Rule 651(c) and that all the claims are frivolous." (Emphasis in original.)

On the facts presented in *Komes*, the Second District concluded that the motion in that case "was plainly less than what the *Greer* court described as sufficient. Further, the record does not satisfy *Greer*'s standards for when a reviewing court can affirm a withdrawal of counsel despite an insufficient motion." *Id.* ¶ 28, 954 N.E.2d 300.

¶ 65 Citing *Komes*, defendant interprets *Greer* as holding that the "sufficiency" of postconviction counsel's motion determines whether the trial court should allow counsel to withdraw. According to this interpretation, the reviewing court should turn to the record only when it determines that the trial court allowed counsel to withdraw despite an "insufficient" motion. In other words, defendant contends that when postconviction counsel's motion is "sufficient" (meaning that it explains why all of the defendant's claims are frivolous or patently without merit), neither the trial court nor the reviewing court need determine whether the record *actually* shows that (1) counsel fulfilled all of her Rule 651(c) duties and (2) the defendant's claims are frivolous or patently without merit. We reject this interpretation of *Greer*.

¶ 66 The *Greer* court held that the trial court properly allowed postconviction counsel's motion to withdraw because the record demonstrated that (1) counsel fulfilled his duties under Rule 651(c) and (2) the defendant's postconviction claims were frivolous and patently without merit. The supreme court also noted, in *dicta*, that an attorney moving to withdraw "*should make some effort*" to explain why the defendant's claims are frivolous or patently without merit. (Emphasis added.) *Greer*, 212 Ill. 2d at 212, 817 N.E.2d at 523. Unlike the *Komes* court and defendant, we do not interpret that latter statement as setting forth the primary standard by which the trial court should determine whether to grant or deny postconviction counsel's motion to withdraw. Instead, we interpret that statement as the supreme court's nonbinding suggestion that attorneys wishing to withdraw as postconviction counsel would be wise to supplement their motion with a brief designed to assist the trial court in making its *Greer* determinations–namely, whether the record shows that (1) counsel fulfilled her Rule 651(c) duties and (2) the defendant's claims are frivolous or patently without merit.

¶ 67 As with any motion that calls upon the trial court to draw legal conclusions from the record, we agree that, as a matter of good practice, the proponent of a motion to withdraw as postconviction counsel should explain in the motion, or in a supporting brief, why the court should make the findings necessary to grant the motion. Counsel should not merely state that the defendant's claims are frivolous or patently without merit, and then leave it to the court to delve into the record to determine whether that assessment is correct. However, postconviction counsel's "effort to explain *why* [the] defendant's claims are frivolous or patently without merit" (emphasis in original) (*Greer*, 212 Ill. 2d at 212, 817 N.E.2d at 523) is not the basis upon which the court should grant or deny the motion to withdraw. That explanation serves merely to assist the court in making the required *Greer* determinations.

¶ 68 Notably, the *Greer* court never used the words "insufficient," "deficient," "improper"–or any synonym thereof–in describing counsel's motion to withdraw in that case. The *Greer* court, commenting upon the motion to withdraw in that case, merely stated that "the procedure in the circuit court leaves something to be desired." *Id.* We note that one year prior to its decision in *Komes*, the Second District's interpretation of *Greer* seemed to be consistent with the interpretation we adhere to in this case. See *People v. Johnson*, 401 Ill. App. 3d 685, 693, 930 N.E.2d 462, 470 (2010) ("As in *Greer*, [postconviction counsel's] decision not to elaborate on why he believed the claims to be meritless 'leaves something to be desired' (*Greer*, 212 Ill. 2d at 212[, 817 N.E.2d at 523]) and makes review of the issue more difficult, but [postconviction counsel] still took the procedural steps necessary for a motion to withdraw [by complying with Rule 651(c)].").

¶ 69        A motion to withdraw as postconviction counsel does not require, as a matter of law, the same type of exhaustive briefing procedures as set forth in *Anders*, as follows:

> "[I]f counsel finds [the defendant's] case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders*, 386 U.S. at 744.

Although postconviction counsel in *Greer* purportedly relied upon *Anders* to justify his motion to withdraw, *Anders* is only relevant when counsel seeks to withdraw from representing a defendant who has a *constitutional* right to counsel. *Finley*, 481 U.S. at 555. Because the right to counsel under the Act is purely statutory (*People v. Owens*, 139 Ill. 2d 351, 364, 564 N.E.2d 1184, 1189 (1990)), *Anders* has no relevance to postconviction counsel's motion to withdraw. See *Finley*, 481 U.S. at 557 ("Since respondent has no underlying constitutional right to appointed counsel in state postconviction proceedings, she has no constitutional right to insist on the *Anders* procedures which were designed solely to protect that underlying constitutional right.").

¶ 70        In *Finley*, the Supreme Court held that when state postconviction proceedings are at issue, "the Constitution does not put the State to the difficult choice between affording no counsel whatsoever or following the strict procedural guidelines annunciated in *Anders*." *Id.* at 559. The *Finley* Court explicitly declined to set forth requirements for the withdrawal of counsel from state postconviction proceedings. Accordingly, in Illinois, a motion to withdraw as counsel at the second stage of postconviction proceedings is not made pursuant to *Anders*, or even *Finley*, but instead, *Greer*. An interpretation of *Greer* that requires counsel to explain why all of the defendant's claims are frivolous or patently without merit is at odds with *Finley*, which held that the Constitution does *not* require *Anders*-like briefing procedures for the withdrawal of postconviction counsel.

¶ 71        We interpret *Greer* to stand for the proposition that the *record itself* determines whether postconviction counsel should be allowed to withdraw. The motion serves as a formal request by counsel to be allowed to withdraw from postconviction representation. The brief in support of the motion serves to aid the trial court in making its determination of whether the record shows that (1) counsel has complied with Rule 651(c) and (2) the defendant's postconviction claims are frivolous or patently without merit. (We note that counsel can satisfy this first prong by simply attaching a Rule 651(c) certificate of compliance to her motion.)

¶ 72        Although the record itself ultimately determines whether counsel should be permitted to withdraw, we do not suggest that the trial court should not consider counsel's determination regarding the merits of the defendant's postconviction claims. Counsel seeking to withdraw should base that determination on the existing record *and* information gleaned during the representation of the defendant. If consultation with the defendant or interviews with other potential postconviction witnesses convinces counsel that the defendant's postconviction claims–although seemingly plausible on their face–are in fact frivolous or patently without merit, nothing in the Act prevents counsel from so attesting to the court in an affidavit attached to the motion to withdraw. Counsel's conclusions then become part of the record itself. This is substantially what counsel did in *Greer* by stating in his motion to withdraw that he had "reviewed the record, transcripts of proceedings, the State's Attorney's files, *and had interviewed 'all relevant parties,' including defendant*," but could find " 'no basis on which to present any meritorious issue for review.' " (Emphasis added.) *Greer*, 212 Ill. 2d at 200, 817

N.E.2d at 516. Of course, as was done in this case, the court may also hold a brief hearing to accept evidence or argument on the motion to withdraw.

¶ 73 Because we disagree that *Greer* requires a "sufficient" motion to withdraw, we decline to address defendant's argument that Mayo's motion was insufficient. Instead, pursuant to *Greer*, we turn directly to whether the record shows that (1) Mayo fulfilled her Rule 651(c) duties and (2) defendant's claims are frivolous or patently without merit.

¶ 74 *1. Mayo's Fulfillment of Her Rule 651(c) Duties*

¶ 75 Defendant argues that the record fails to show that Mayo fully complied with her Rule 651(c) duties because, although the record clearly indicates that Mayo consulted with defendant, it does not show that she did so *to ascertain his claims*. (Defendant concedes that (1) Mayo fulfilled her Rule 651(c) duty to examine the record of the proceedings, and (2) the Rule 651(c) requirement that counsel make any amendments to the *pro se* petition necessary for an adequate presentation of defendant's contentions does not apply when, as here, counsel deems defendant's claims to be frivolous and patently without merit. See *Greer*, 212 Ill. 2d at 205, 817 N.E.2d at 519.)

¶ 76 Rule 651(c) provides, in pertinent part, that the record filed in the reviewing court "shall contain a showing, which may be made by the certificate of [the defendant's] attorney, that the attorney has consulted with [the defendant] by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights." Ill. S. Ct. R. 651(c) (eff. Apr. 26, 2012). Defendant asserts that because Mayo's motion to withdraw did not address his claim regarding Sharp's alleged lies, the record contains no showing that Mayo consulted with him regarding that claim. However, even if *Greer* required counsel, as a matter of law, to explain why all of the defendant's claims were frivolous or patently without merit–which it does not–we would still fail to see the logic in defendant's argument. Defendant does not explain why Mayo's failure to address all of defendant's claims in her motion *must* mean that the rest of the record contains no showing that Mayo consulted with defendant regarding all of his claims.

¶ 77 Contrary to defendant's assertion, the record does show that Mayo consulted with defendant regarding all of his postconviction claims. Mayo filed a petition for payment of attorney fees, to which she attached a time sheet indicating that she spent at least 6.1 hours consulting with defendant, either by telephone or in person. Further, Mayo stated in her motion to withdraw that "after conducting a thorough review of the issues raised by [defendant], court-appointed counsel herein has concluded that the issues raised by [defendant] are without merit and unsupportable as a matter of law." Most significantly, defendant's own words, as contained in his motion to strike, show that Mayo consulted with him about each of the claims in his petition, and even some claims not included in his petition:

"[Defendant] has discussed his former counsel Sharp's ineffectiveness with postconviction counsel Mayo on several occasions. [Defendant] has stated to Mayo that Sharp lied to him, falsified evidence, refused to investigate his mental history, and sent him a letter attempting to rush him and coerce him into accepting a plea of guilty."

On this record, we conclude that Mayo sufficiently fulfilled her Rule 651(c) duties.

¶ 78 *2. Defendant's Claims Are Frivolous and Patently Without Merit*

- 13 -

¶ 79                    a. Sharp's Failure To Investigate Defendant's Mental Health

¶ 80         As previously explained, defendant interprets *Greer* as allowing postconviction counsel to withdraw when counsel files a motion explaining why all the defendant's claims are frivolous or patently without merit. Defendant's interpretation of *Greer* also provides that when the trial court allows counsel to withdraw despite a motion that fails to address *all* of the defendant's postconviction claims, a reviewing court may nonetheless affirm if the record shows that (1) counsel fulfilled her Rule 651(c) duties and (2) the defendant's *unaddressed* claims are frivolous or patently without merit. Consistent with this interpretation of *Greer*, defendant does not present argument on the merits of his first postconviction claim (the claim relating to Sharp's investigation of defendant's mental health) because Mayo explained in her motion why that claim was frivolous or patently without merit. Defendant apparently reasons that because Mayo's motion to withdraw was "sufficient" as to defendant's first claim, that claim has been disposed of and it is not at issue in this appeal. Because this apparent concession is based upon defendant's erroneous interpretation of *Greer*, we address his first claim only by stating our conclusion that, based upon our thorough review of the record, Sharp did not render ineffective assistance of counsel by failing to further investigate defendant's mental health. Accordingly, that claim is frivolous and patently without merit.


¶ 81                                   b. Sharp's Alleged Lies

¶ 82         Defendant's second postconviction claim, which Mayo did not specifically address in her motion to withdraw, alleged that Sharp was ineffective because he told "lies" to defendant, Pam, and Julie "in order to force a guilty plea upon [defendant]." On appeal, defendant argues that because the trial court advanced his petition to the second stage based upon its finding that the petition was "not frivolous or patently without merit," this postconviction claim must actually have merit. (For whatever reason, defendant declines to extend this logic to his first postconviction claim, which he apparently concedes lacks merit simply because Mayo said so in her motion to withdraw.) We emphatically disagree with the conclusion that defendant draws from the court's first-stage ruling.

¶ 83         The supreme court has explained the standard applicable to first-stage postconviction proceedings, as follows:

> "[A] *pro se* litigant need only present the gist of a constitutional claim to survive the summary stage of section 122-2.1. [Citation.] With regard to this requirement, a defendant at the first stage need only present a limited amount of detail [citation], and he need not make legal arguments or cite to legal authority [citation]. This is a purposely low threshold for survival because most petitions are drafted at this stage by defendants with little legal knowledge or training." *People v. Ligon*, 239 Ill. 2d 94, 104, 940 N.E.2d 1067, 1073 (2010).

Defendant implicitly argues that whenever a postconviction petition passes the first-stage threshold described above, counsel is thereafter barred from withdrawing because the trial court has already conclusively determined that the defendant's claims are *not* frivolous or patently without merit.

¶ 84         Defendant's argument drastically overstates the significance of a petition's ability to survive the "purposely low threshold" of first-stage proceedings. *Id*. The trial court makes its first-stage determination in the absence of full detail, legal arguments, or legal authority. *Id*.

Because "most petitions are drafted at this stage by defendants with little legal knowledge or training" (*id*.), the defendant's claims may be greatly exaggerated, presented in a misleading way, unsupported by the record, or procedurally defaulted. Given the Act's purposely low threshold, such fatal flaws, discovered later, may nonetheless easily pass muster at the first stage of proceedings. It is only at the second-stage–after a lawyer has consulted with the defendant, reviewed his claims and the supporting record, conducted any necessary legal research, and interviewed any potential postconviction witnesses–that a more reliable determination of the merits of the defendant's claims can be made.

¶ 85    In this case, Mayo's affidavit for attorney fees indicates that she began preparing her motion to withdraw after first spending at least 13 hours corresponding with defendant, reviewing the record, and researching legal issues. We reject defendant's contention that the court's first-stage ruling, in and of itself, conclusively rebuts Mayo's determination that defendant's claims are frivolous or patently without merit.

¶ 86    Turning to the merits of defendant's ineffective-assistance claim relating to Sharp's alleged lies, defendant argues in his brief that "the affidavits and petition at issue here establish that Sharp falsely told [Pam and Julie] that blood had been found on [defendant's] shirt, and that that blood would most likely match Geldrich." Defendant misstates the postconviction claim at issue. Defendant's *petition* stated merely that Sharp told defendant, Pam, and Julie "lies" in order to "force a guilty plea upon [defendant]." The petition then describes a purported specific lie, as follows:

> "[Sharp] asked [defendant's] mother, Julie Meyer, and his aunt, Pam Meyer, to 'convince' [defendant] that it was in his best interest to plead guilty to attempted first degree murder and home invasion *and that if he did he would receive between 12 and 20 years*." (Emphasis added.)

The *only* mention of a T-shirt comes from the following statement in Pam's affidavit: "Sharp told us about some evidence they had against [defendant], including [defendant's] T-shirt with blood on it, saying it was probably the victim's. It ended up being someone else's blood and had nothing to do with the case." Although defendant's petition cites to other portions of Pam's and Julie's affidavits, the petition makes absolutely no mention of the alleged bloody T-shirt or any statements Sharp made in relation to the T-shirt. Despite the absence of any mention of the T-shirt in defendant's actual petition, defendant's entire argument on appeal hinges on Sharp's alleged lies concerning the T-shirt, which defendant characterizes as "false representations of the evidence." Defendant argues that Sharp's alleged statements regarding the T-shirt constituted ineffective assistance of counsel and rendered defendant's guilty plea involuntary.

¶ 87    Section 122-2 of the Act provides, in pertinent part, as follows:

> "The *petition* shall *** *clearly set forth* the respects in which petitioner's constitutional rights were violated. The petition shall have attached thereto affidavits, records, or other evidence supporting *its allegations* or shall state why the same are not attached." (Emphases added.) 725 ILCS 5/122-2 (West 2008).

For the first time on appeal, defendant attempts to draw from Pam's affidavit a claim that appears nowhere in his actual petition. Section 122-2 of the Act makes clear that the petition itself defines the scope of the defendant's claims. The affidavits serve merely to support the allegations in the petition.

¶ 88        Because defendant neither provided an affidavit of his own nor mentioned the T-shirt in his petition, the record provides no support for defendant's contention–which he makes for the first time on appeal–that Sharp's alleged statements regarding the T-shirt rendered his guilty plea involuntary. Further, neither at the hearing on defendant's motion to withdraw his guilty plea nor at the hearing on Mayo's motion to withdraw did defendant ever mention the T-shirt or Sharp's statements regarding the T-shirt. Accordingly, despite his contention on appeal, defendant never raised a claim of ineffective assistance of counsel in connection with Sharp's alleged statements about the T-shirt. Therefore, under *Greer*, we need not address Sharp's alleged statements about the T-shirt because that issue made up no part of defendant's actual postconviction claims. In other words, under *Greer*, we need only address the merits of the postconviction claims that defendant *actually* raised. See *People v. Davis*, 156 Ill. 2d 149, 164, 619 N.E.2d 750, 758 (1993) ("Post-conviction counsel is only required to investigate and properly present the *petitioner's* claims." (Emphasis in original.)).

¶ 89        Even assuming, *arguendo*, that defendant's petition had properly alleged that Sharp was ineffective for making false statements about the T-shirt, we would still deem that claim frivolous and patently without merit because the record establishes that no prejudice resulted. "A defendant may enter a plea of guilty because of some erroneous advice by his counsel; however, this fact alone does not destroy the voluntary nature of the plea." *People v. Correa*, 108 Ill. 2d 541, 548-49, 485 N.E.2d 307, 310 (1985). Even assuming Sharp's statements gave defendant the false impression that the State found blood on defendant's T-shirt, and that such blood "probably" belonged to Geldrich, such evidence, if it actually existed, would have added virtually nothing to the State's case against defendant. At defendant's sentencing hearing, Detective Ryan Sims testified that during an interview with defendant prior to his guilty plea, defendant told Sims that while he was inside Geldrich's home, he reached out and touched Geldrich to determine whether she was breathing. Sharp gave the following testimony at the hearing on defendant's motion to withdraw his guilty plea: "When [defendant] checked Mrs. Geldrich's pulse points, he indicated he put his hands inside of his shirt and checked her pulse by trying to feel through his shirt for a pulse on her neck." Defendant has never disputed that he was inside of Geldrich's home or that he made physical contact with her. The presence of Geldrich's blood on defendant's shirt would have proved nothing more than what defendant had already admitted to investigators prior to his guilty plea. Moreover, because the State charged defendant with attempt (first degree murder) on a theory of accountability, the State was not even required to prove that defendant made physical contact with Geldrich. Defendant has never, during the entire course of his criminal or postconviction proceedings, alleged that he entered his guilty plea based upon the false impression that investigators found blood on his T-shirt. The record shows that defendant's guilty plea was not rendered involuntary based upon Sharp's alleged statements regarding the T-shirt.

¶ 90        Additionally, we note that defendant forfeited his claim regarding Sharp's alleged statements about the T-shirt by failing to include that issue in his motion to withdraw his guilty plea. Defendant does not claim that defense counsel Liles was ineffective for failing to argue that issue. Therefore, because defendant forfeited his claim regarding the T-shirt and he does not offer an excuse for his procedural default, we also find defendant's claim frivolous and patently without merit on the basis of forfeiture. See *People v. Alcozer*, 241 Ill. 2d 248, 258, 948 N.E.2d 70, 77 (2011) ("[P]ostconviction petitions dismissed on principles of forfeiture or *res judicata* are, necessarily, both frivolous and patently without merit.").

¶ 91    What defendant *actually* alleged in his petition was that Sharp lied regarding the possible prison term that defendant would face if he pleaded guilty. This specific allegation was addressed at the hearing on defendant's motion to withdraw his guilty plea, at which Sharp testified that he never made any such guarantee to defendant. At that hearing, defendant also testified, as follows:

> "[THE STATE]: So you entered the plea and knew your minimum was 12 years and maximum was [120], right?
>
> [DEFENDANT]: Yes, I understood that, but–
>
> Q. And at the time that you entered your plea, you did so hoping that your timely plea of guilty and cooperation with the State's Attorney's office would benefit you and you would receive a lesser sentence than your co-defendant, Mr. Lloyd, is that a fact?
>
> A. Yes.
>
> Q. And so it was not a situation where you [pleaded] guilty because you had some type of a–you felt you had a promise or guarantee of a particular number, but rather hoped you would be able to stay under 20 by virtue of the fact you had cooperated, is that a fair statement?
>
> A. Yes. The Judge did say in that hearing I was facing 12 to 120, but Mr. Sharp told me that he was going to say that. He said I couldn't be promised a sentence as specific as between 12 and 20 because I wouldn't be a reliable witness if I had to testify in Bruce Lloyd and Chris Howell's trial."

We conclude that defendant's own testimony affirmatively rebuts his postconviction claim that Sharp's alleged lies rendered his guilty plea involuntary. Defendant's responses to the trial court's admonishments at the guilty-plea hearing also rebut his claim. See *Greer*, 212 Ill. 2d at 211, 817 N.E.2d at 523 ("[A] defendant's acknowledgement in open court, at a plea proceeding, that there were no agreements or promises regarding his sentence, served to contradict his postconviction assertion that he pled guilty in reliance upon an alleged, undisclosed promise by defense counsel regarding sentencing."). Accordingly, we deem defendant's claim frivolous and patently without merit.

¶ 92    Because we deem defendant's ineffective-assistance-of-trial-counsel claim frivolous and patently without merit, we necessarily reject defendant's other postconviction claim that his appellate counsel was ineffective for failing to argue Sharp's ineffectiveness on direct appeal.

¶ 93    Pursuant to *Greer*, we affirm the trial court's grant of Mayo's motion to withdraw as postconviction counsel because the record shows that (1) Mayo fulfilled all of her Rule 651(c) duties and (2) defendant's postconviction claims are frivolous and patently without merit. Because we so conclude, we also affirm the trial court's judgment dismissing defendant's postconviction petition on the State's motion.

¶ 94                                    III. CONCLUSION

¶ 95    For the foregoing reasons, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment as costs of this appeal.

¶ 96    Affirmed.