2022 IL App (4th) 200325

NO. 4-20-0325

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 30, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County. |
| DANNY KUEHNER, | ) | |
| Defendant-Appellant. | ) | No. 05CF724 |
| | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1        In October 2005, defendant, Danny Kuehner, entered an open plea of guilty to attempt (first degree murder) (720 ILCS 5/8-4, 9-1(a)(1) (West 2004)) and home invasion (*id.* § 12-11(a)(2)). Defendant was 17 years old when he committed these offenses. The trial court sentenced defendant to a total of 35 years in prison. This court affirmed defendant's conviction and sentence on direct appeal. *People v. Kuehner*, No. 4-07-0426 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 2        In May 2009, defendant *pro se* filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)). After advancing the petition to the second stage, the trial court granted appointed counsel's motion to withdraw and the State's motion to dismiss. This court affirmed on appeal. *People v. Kuehner*, 2014 IL App (4th)

120901, ¶ 95, 8 N.E.3d 1148. The Illinois Supreme Court reversed, holding that counsel's motion to withdraw was inadequate because it failed to address each of defendant's *pro se* claims. *People v. Kuehner*, 2015 IL 117695, ¶ 27, 32 N.E.3d 655.

¶ 3         On remand, in May 2018, defendant filed an amended petition for postconviction relief. The trial court dismissed defendant's amended postconviction petition after a second-stage hearing, and this court affirmed. *People v. Kuehner*, 2020 IL App (4th) 180771-U, ¶ 122.

¶ 4         In October 2019, defendant *pro se* filed a motion for leave to file a successive postconviction petition, asserting (1) his guilty plea was induced by the threat of an unconstitutional life sentence and (2) his sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). In June 2020, the trial court denied defendant's motion because he failed to establish cause and prejudice.

¶ 5         Defendant appeals, arguing that his petition adequately demonstrated cause and prejudice to assert in a successive petition that (1) his guilty plea was induced by the threat of an unconstitutional life sentence and (2) his 35-year prison sentence violates the proportionate penalties clause and the eighth amendment.

¶ 6         We disagree and affirm the trial court's judgment.

¶ 7                              I. BACKGROUND

¶ 8                              A. The Initial Charges

¶ 9         In June 2005, the State charged defendant with attempt (first degree murder) (count I) (720 ILCS 5/8-4, 9-1(a)(1) (West 2004)), home invasion (count II) (*id.* § 12-11(a)(2)), residential burglary (count III) (*id.* § 19-3(a)), robbery of a senior citizen (count IV) (*id.* § 18-1(a)), aggravated battery of a senior citizen (count V) (*id.* § 12-4.6(a)), and criminal damage to property

(count VI) (*id.* § 21-1(1)(a)). The charges alleged that defendant, or someone for whom he was legally responsible, broke into the home of Margaret Geldrich and stole jewelry from her residence. The charges also alleged that she was beaten and suffered broken bones and a dislocated shoulder. The State later filed counts VII through XI, which repeated counts I through V, but also alleged that defendant was eligible for extended-term sentencing because Geldrich was over 60 years old at the time of the offenses and they were accompanied by exceptionally brutal or heinous behavior. 730 ILCS 5/5-5-3.2(b)(2), (b)(4)(ii) (West 2004).

¶ 10                              B. The Guilty Plea Hearing

¶ 11          In October 2005, defendant tendered a guilty plea to attempt (first degree murder) (count VII) and home invasion (count VIII). In exchange, the State dismissed the remaining counts and a separate charge of armed robbery in another case. There was no agreement as to sentence. The trial court admonished defendant that the penalty for each count was from 6 to 60 years in prison, mandatorily consecutive, to be served at 85%. The court explained that defendant would receive a sentence between 12 and 120 years. The defendant stated that he understood.

¶ 12          Before accepting the plea, the court inquired into defendant's age, education, and mental status. Defendant answered that he was 17 years old, had finished eighth grade, and was hospitalized for depression (with thoughts of self-harm) the day he was arrested. Defendant stated that his depression was under control, that he was taking medication for his depression, and that neither his depression nor his medication affected his ability to understand his guilty plea. Defendant's counsel stated that (1) he had spoken to defendant several times at length, (2) he never had any problems communicating with defendant, and (3) defendant's responses were always appropriate. The court admonished defendant regarding the rights he was giving up by pleading guilty, and defendant stated he understood.

¶ 13    As a factual basis for the plea, the State informed the trial court that, on the morning of June 3, 2005, a relative of the victim found the 98-year-old Geldrich "in a pool of blood, unconscious." The State continued as follows:

> "A police investigation began at that time. Mrs. Geldarich [*sic*] was taken to the hospital. She had extensive injuries. She had fractures on both sides of her face, she had a fracture on her arm, dislocation of her shoulder, and a substantial amount of bleeding from her head and her face. There was even blood spattered on the stove from where her face had been stomped while she was on the ground.
>
> She was treated for a significant period of time, was eventually able to regain consciousness and was eventually interviewed."

¶ 14    Later that day, the police were investigating an armed robbery of a cab driver. While the cab driver was speaking with the police, the cab driver recognized one of his assailants in a truck that drove by. The police stopped the truck and found Brandon Lloyd driving and defendant hiding in the back. The cab driver identified defendant and Lloyd as the two men who robbed him at knifepoint. The police found jewelry belonging to Geldrich inside of the truck.

¶ 15    Upon interviewing defendant and Lloyd, the police learned of the involvement of a third individual—a juvenile named C.H. Lloyd claimed that it was C.H.'s idea that defendant and Lloyd enter Geldrich's home. When the police questioned C.H., he claimed he went home (which was one house away) after defendant and Lloyd broke Geldrich's window with a hammer and entered her home. C.H. also told the police that about 35 minutes later, defendant "came back" and told C.H. that Geldrich was screaming inside of the home.

¶ 16    When questioned by the police, C.H. and defendant both claimed that Lloyd was the one who attacked Geldrich, while Lloyd claimed that defendant was the one who beat Geldrich.

At this point in the factual basis, the prosecutor stated, "however, under the common design rule and the accountability rule, the actual identity of the particular beater is not important for purposes of the plea, at least for the guilt/innocence phase." The prosecutor then finished the factual basis by informing the trial court that Geldrich told the police there were two people inside of her home and she had to pretend to be dead in order to make the beating stop.

¶ 17    Defense counsel stipulated that the State would present this evidence if the case went to trial. The court then accepted defendant's guilty plea, finding it to be knowingly and voluntarily made. Defense counsel requested the preparation of a presentence investigation report (PSI).

¶ 18    Defendant's sentencing hearing was thereafter continued several times by agreement to allow defendant to "create some mitigation" for himself by testifying against C.H. and Lloyd at their respective trials.

¶ 19                    C. Post-plea Proceedings

¶ 20                    1. *Defendant's Motion to Withdraw Guilty Plea*

¶ 21    In November 2006, the parties convened for defendant's sentencing hearing. Defendant *pro se* tendered to the court a handwritten motion (1) to withdraw his guilty plea and (2) for a new attorney. Defendant alleged that his plea was coerced by his attorney, John Sharp. He claimed his attorney told him if he did not plead guilty, the plea offer would be given to Lloyd and Lloyd would testify falsely against defendant. The court granted defendant's motion for new counsel. Defendant later retained new counsel, Sean Liles.

¶ 22    Liles filed an amended motion to withdraw guilty plea that repeated the allegations in defendant's *pro se* motion and additionally alleged that (1) plea counsel told defendant he would receive between 12 and 20 years, (2) at the time of defendant's guilty plea, he had been taking his

depression medication for only one month and its effects were unknown to him, and (3) plea counsel did not investigate defendant's mental condition at the time of his plea or at the time of the offense.

¶ 23        In February 2007, the trial court conducted a hearing on defendant's motion to withdraw his guilty plea. Defendant testified that Sharp told him he would receive between 12 and 20 years' imprisonment if he pled guilty. Sharp testified that defendant understood he was facing 12 to 120 years but Sharp informed defendant he would "try to get him between 12 and 20 years" due to defendant's age, lack of adult convictions, and willingness to cooperate.

¶ 24        Relevant to this appeal, the State offered a copy of defendant's testimony at C.H.'s trial. In that testimony, defendant explained that he was 17 at the time of the offense and that he had pleaded guilty to attempt (first degree murder) and home invasion based on an accountability theory. He also testified that, on the night of the robbery, he, C.H., and Lloyd spent most of the evening drinking liquor, smoking marijuana, and traveling between various friends' houses. As they were walking toward C.H.'s house, defendant and C.H. recalled a friend who claimed to have stolen jewelry from a deaf and blind woman who lived near C.H. The friend claimed to have stolen jewelry and other items while the woman was present without her knowing. The three then discussed breaking into the same woman's home to steal electronics and jewelry. The plan was for Lloyd to break into the house and unlock the door for defendant, while C.H. would stay outside and be the lookout.

¶ 25        Defendant testified that Lloyd broke into a window and was halfway in when "someone started yelling." Defendant ran to C.H.'s house, where he found C.H. The two went back to Geldrich's house and found the front door open and the lights on. Defendant went inside and found Lloyd "throwing shit around, putting stuff in his pockets." The woman was lying on the

floor, not moving. Defendant touched her to see if she was breathing. He testified, "She looked bad. I mean, she didn't—I didn't remember seeing no blood or anything. I don't remember, but she couldn't move. She wasn't getting up. She wouldn't get up, though, so it looked bad." Defendant walked outside and confronted Lloyd when he followed. Defendant testified that Lloyd claimed he pushed Geldrich down because she kept yelling. The trio walked away and did not call for help. Defendant testified that Lloyd threatened to kill defendant and C.H. if they went to the police.

¶ 26 At the conclusion of the hearing, the trial court denied defendant's motion, finding that there was "nothing in the record that would indicate [defendant's] plea was not entered into knowingly, voluntarily, without coercion."

¶ 27 *2. The Sentencing Hearing*

¶ 28 The trial court conducted defendant's sentencing hearing immediately after it denied the motion to withdraw guilty plea.

¶ 29 a. Evidence in Aggravation

¶ 30 The State called Detective Ryan Sims, who testified that he investigated the robbery and beating of Geldrich. Sims testified that he saw Geldrich at the hospital and she "had extensive swelling, bleeding and bruising on her face." He testified that she was conscious but could not open her eyes. The State introduced photos of Geldrich taken at the hospital and at her home, which showed the severity of the injuries. In one photo, Geldrich is lying on the floor of the kitchen in front of a stove with blood on the floor.

¶ 31 Sims testified that he interviewed defendant and defendant made statements that were substantially similar to defendant's testimony at C.H.'s trial. Defendant also told Sims that defendant went into the house and reached out to touch Geldrich to see if she was breathing

- 7 -

because, due to the severity of her injuries, he thought she might be dead.

¶ 32       On cross-examination, Sims acknowledged that defendant and C.H. denied involvement in the beating. Sims further stated that no blood of the victim was found on defendant's clothing.

¶ 33       Stephanie Coonrod testified that she was Geldrich's second cousin and legal guardian at the time of the robbery. Geldrich was 98 years old and legally deaf and blind. Geldrich had difficulty seeing and hearing but was able to cook, clean, and perform yard work. Coonrod testified that Geldrich was five feet tall and weighed 98 pounds.

¶ 34       Coonrod testified that she arrived at 7 a.m. at Geldrich's house and heard Geldrich yelling for help. Coonrod saw her lying on the floor with "a pool of blood by her nose ***. She was all black and blue." Coonrod stated, "I figured she was going to die right there."

¶ 35       Coonrod testified that, at the hospital, Geldrich told her that two or three boys came through her bathroom window and beat her. Geldrich thought they were going to kill her, so she played dead to make them stop. Coonrod stated that Geldrich was in the hospital for four days and then went to a nursing home for two weeks.

¶ 36       Coonrod testified that Geldrich was able to go home but she was afraid. Geldrich was no longer able to cook for herself because her eyesight was significantly worse. Geldrich died about a year after the robbery. When asked what life was like for Geldrich, Coonrod stated as follows: "Well, she just wanted to die. That's what she said most of the time. She said, I wish I could just die. She just gave up on life." Coonrod continued that Geldrich

> "was always a very independent lady, never married, always lived alone *** and
> then every day you would go over and she would just beg to die because she wasn't
> able to function like she had before. And, plus, her feet—I guess they must have

stomped on her feet because she complained they hurt, hurt all the time. Her

shoulder hurt her, and, like I say, her eyesight had gotten a lot worse."

¶ 37                                b. Evidence in Mitigation

¶ 38        Defendant's aunt and mother testified on his behalf in mitigation. They emphasized

defendant's prior mental illness, drug addiction, young age, and lack of any role in the actual

beating.

¶ 39        In allocution, defendant stated that he was very sorry for what happened and that

he wished he could "go back to that night and stop [Lloyd] from going to her home because she

did not deserve what happened to her." Defendant stated, however, that he "[could] not accept

responsibility for [Geldrich] being hurt because [he] did not hurt her." Defendant continued, "I

never said I was innocent of all this, but I don't believe I'm guilty of Attempted Murder or any of

the charges involved with Miss Geldrich getting hurt."

¶ 40        Defendant emphasized his young age, reminding the court that he was 18 years old

and had been arrested three weeks after his seventeenth birthday. He stated that he has not had a

chance to live his life as an adult. He told the court that a sentence of 30-to-40 years would ruin

his life and asked the court for a "second chance at life."

¶ 41                                c. The Trial Court's Ruling

¶ 42        The trial court noted that in rendering its sentence it considered the factual basis for

the plea, the PSI, the victim impact statements, the evidence in aggravation and mitigation, the

arguments of counsel, and defendant's allocution. The PSI filed with the court contained a detailed

history of defendant, including his prior delinquency, his family and background, his mental and

physical health, his education, and his history of substance abuse. The State recommended a

sentence of 40 years, acknowledging that defendant should receive something less than Lloyd's

50-year sentence. Defendant's attorney argued for a 25-year sentence, emphasizing defendant's young age, lack of relationship with his father, history of mental illness, and substance abuse problems.

¶ 43       The trial court first noted that it had "heard no competent evidence that this [d]efendant threw a punch, threw a kick or in any way personally injured the victim ***. And it's clear also that this [d]efendant is less involved than Bruce Lloyd." However, the court also noted that, legally, defendant was just as culpable as if he performed the beating himself. Still, the court stated it would be giving defendant a lesser sentence than the 50 years it had given Lloyd. The court noted that "[defendant] was involved apparently in the planning of this, in the commission of the crime and significantly after the victim was beaten and left for dead, he gladly and willfully participated in reaping the fruits of the crime. It didn't appear there was any remorse at that time."

¶ 44       The court summarized its thoughts about the crime as follows:

"So this is a very heinous crime, very shocking crime, one of the more shocking crimes we have seen in this area for some time. The victim's age is obvious. The fact that the victim was physically handicapped is obvious. This Defendant and his cohorts really can on that night for reasons known only to them objectively be viewed as having been barbarians. They were predators. They preyed on this poor old lady, picked her out, the weak sheep in the flock, and attacked her, beat her almost to death for no reason. She had done nothing to them. This crime does shock the consciousness."

¶ 45       Ultimately, the trial court sentenced defendant to 17½ years on each count, for a total of 35 years in prison. The court explained that the sentence was a 40% reduction from Lloyd's sentence, which accounted for defendant's (1) cooperation and (2) his relative culpability in that

he did not personally inflict the injuries. The court further commented that the sentence was very much on the low end of the 12-to-120-year permissible range.

¶ 46                              D. The Direct Appeal

¶ 47        On direct appeal, defendant argued only that the trial court abused its discretion by giving him a 35-year sentence. Defendant claimed the sentence was excessive, given (1) his low level of participation, (2) his young age, and (3) his potential for rehabilitation. This court affirmed defendant's sentence, noting that the record demonstrated that the trial court expressly considered these factors and chose a sentence on the low end of the sentencing range. *Kuehner*, No. 4-07-0426 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 48                         E. The Postconviction Petition

¶ 49        In May 2009, defendant *pro se* filed a petition for postconviction relief, alleging Sharp was ineffective for (1) failing to investigate defendant's mental health issues and (2) providing false and misleading information to defendant and his family in order to get him to plead guilty. The trial court advanced the petition to the second stage and appointed counsel. The State filed a motion to dismiss, and counsel filed a motion to withdraw. The trial court granted both motions, and this court affirmed on appeal. *Kuehner*, 2014 IL App (4th) 120901, ¶ 95.

¶ 50        The Illinois Supreme Court reversed and remanded for further proceedings, holding that counsel's motion to withdraw was inadequate because it failed to address each of defendant's *pro se* claims. *Kuehner*, 2015 IL 117695, ¶ 27.

¶ 51        In May 2018, new postconviction counsel filed an amended postconviction petition that reframed defendant's claims of ineffective assistance of trial counsel and added claims of ineffective assistance of postconviction counsel and appellate counsel. The amended petition did not allege any challenge to defendant's plea or sentence.

¶ 52        In September 2018, following a second-stage hearing, the trial court granted the State's motion to dismiss defendant's amended petition. This court affirmed. *Kuehner*, 2020 IL App (4th) 180771-U, ¶ 1.

¶ 53        F. The Motion for Leave To File a Successive Postconviction Petition

¶ 54        In October 2019, defendant *pro se* filed a motion for leave to file a successive postconviction petition, alleging (1) his guilty plea was not knowing and voluntary because it was induced by the threat of an unconstitutional *de facto* life sentence and (2) his 35-year sentence violated the proportionate penalties clause and the eighth amendment.

¶ 55        The trial court denied defendant's motion for leave to file a successive postconviction petition because defendant "fail[ed] to satisfy the cause and prejudice test under [section 122-1(f) of the Act]."

¶ 56        This appeal followed.

¶ 57                              II. ANALYSIS

¶ 58        Defendant appeals, arguing that his petition adequately demonstrated cause and prejudice to assert in a successive petition that (1) his guilty plea was induced by the threat of an unconstitutional life sentence and (2) his sentence of 35-years' imprisonment violates the proportionate penalties clause and the eighth amendment.

¶ 59        We disagree and affirm the trial court's judgment.

¶ 60                      A. Defendant's Challenge to His Guilty Plea

¶ 61        Defendant first argues that the trial court erred by denying him leave to file, in a successive petition, his claim that his guilty plea was not knowing and voluntary because it was induced by the threat of an unconstitutional life sentence. Specifically, defendant asserts that, at the time of his guilty plea (in 2005), he was admonished that he could receive up to 120 years in

- 12 -

prison but, under *Graham v. Florida*, 560 U.S. 48, 82 (2010), *People v. Reyes*, 2016 IL 119271, 63 N.E.2d 884 (*per curiam*), and *People v. Buffer*, 2019 IL 122327, 137 N.E.3d 763, the most he could constitutionally receive as a juvenile offender was 40 years in prison.

¶ 62     Defendant contends that he established cause to bring this claim because the *Graham*, *Reyes*, and *Buffer* cases were not decided when he filed his initial petition in 2009. Defendant argues that he established prejudice because he pled guilty under the misapprehension that he could be sentenced to 120 years in prison.

¶ 63                                 1. *The Applicable Law*

¶ 64     The Act provides a mechanism for a defendant to assert that, in the proceedings which resulted in his conviction, there was a substantial denial of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2020). The Act contemplates the filing of a single petition. *Id.* § 122-1(f) ("Only one petition may be filed by a petitioner under this Article without leave of the court."). Any claim of a constitutional deprivation not raised in the original or an amended petition is waived. *Id.* § 122-3.

¶ 65     A defendant may obtain leave to file a successive petition "only if [he] demonstrates cause for his *** failure to bring the claim in his *** initial post-conviction proceedings and prejudice results from that failure." *Id.* § 122-1(f). A defendant shows (1) "cause by identifying an objective factor that impeded his *** ability to raise a specific claim during his *** initial post-conviction proceedings" and (2) "prejudice by demonstrating that the claim not raised during his *** initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*; *People v. Lusby*, 2020 IL 124046, ¶ 27.

¶ 66     A defendant requesting leave to file a successive postconviction petition must make a *prima facie* showing of both cause and prejudice. *People v. Bailey*, 2017 IL 121450, ¶ 24, 102

N.E.3d 114. A failure to establish either prong is fatal to the claim. *People v. Howard*, 2021 IL App (2d) 190695, ¶ 21.

¶ 67     A trial court's denial of leave to file a successive postconviction petition is reviewed *de novo*. *Lusby*, 2020 IL 124046, ¶ 27. A reviewing court may affirm a trial court's judgment on any basis supported by the record. *People v. Smith*, 2013 IL App (4th) 110220, ¶ 21, 986 N.E.2d 1274. A defendant's motion for leave to file a successive postconviction petition should be denied when the defendant's claims fail as a matter of law. *People v. Smith*, 2014 IL 115946, ¶ 35, 21 N.E.3d 1172.

¶ 68                     2. *This Case*

¶ 69     The trial court properly denied defendant leave to file his claim that he was wrongfully admonished because his claim fails as a matter of law. The *Graham*, *Reyes*, and *Buffer* line of cases that defendant relies upon does not establish that the maximum sentence defendant could have received was 40 years.

¶ 70     In *Graham*, the United States Supreme Court held that the eighth amendment prohibits a juvenile nonhomicide offender from being sentenced to life imprisonment without parole. *Graham*, 560 U.S. at 74. The Court reasoned that a juvenile nonhomicide offender must be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. The Court held that "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life." *Id.* It does, however, prohibit the states from "making the judgment at the outset" through mandatory life sentence statutes. *Id.*

¶ 71     Subsequently, in *Miller v. Alabama*, 567 U.S. 460, 489 (2012), the Court held that its reasoning in *Graham* applied equally to juvenile homicide offenders and concluded that "the

Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. Like in *Graham*, the Court noted that it was not foreclosing the imposition of a life sentence for a juvenile offender in a homicide case but only the imposition of such a sentence without "tak[ing] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 72 Several years later, in *Reyes*, the Illinois Supreme Court held that a juvenile offender's mandatory minimum sentence of 97 years for first degree murder and attempted murder (with mandatory firearm enhancements) violated the eighth amendment. *Reyes*, 2016 IL 119271, ¶ 10. In that case, under truth-in-sentencing statutes, the 16-year-old defendant was required to serve at least 89 years before becoming eligible for parole. *Id.* The court reasoned that this sentence mandated that the defendant remain in prison until at least the age of 105. *Id.* Accordingly, the defendant's sentence was a mandatory *de facto* life-without-parole sentence, which was unconstitutional under *Miller*. *Id.*

¶ 73 Finally, in *Buffer*, 2019 IL 122327, ¶ 41, the Illinois Supreme Court declared that any sentence imposed on a juvenile that exceeded 40 years constituted a *de facto* life sentence.

¶ 74 Defendant argues that *Graham* (prohibiting mandatory life-without-parole for nonhomicide offenders), *Reyes* (holding that a *de facto* life sentence is the constitutional equivalent of a mandatory life sentence), and *Buffer* (holding that any sentence over 40 years is a *de facto* life sentence), taken together, establish that defendant could not have constitutionally been sentenced to more than 40 years.

¶ 75 However, in piecing together only the language from *Graham*, *Reyes*, and *Buffer* that defendant finds favorable to his argument, defendant ignores that *in each case* the court acknowledged that a life sentence for a juvenile offender may still be imposed under certain

- 15 -

circumstances.

¶ 76 For example, the *Graham* Court stated, "Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life." *Graham*, 560 U.S. at 75. In *Reyes*, the court observed that *Miller* "was not a categorical prohibition of life-without-parole sentences for juvenile murderers." *Reyes*, 2016 IL 119271, ¶ 4. And in *Buffer*, the court noted that " '*Miller* and *Montgomery* send an unequivocal message: Life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, *unless* the trial court considers youth and its attendant characteristics.' " (Emphasis added.) *Buffer*, 2019 IL 122327, ¶ 25 (quoting *People v. Holman*, 2017 IL 120655, ¶ 40).

¶ 77 Defendant's argument also ignores other well-established precedent that contradicts his claim that he could not, under any circumstance, have been sentenced in excess of 40 years. For example, in *Lusby*, the Illinois Supreme Court held that a 16-year-old defendant's 130-year prison sentence for first degree murder, aggravated criminal sexual assault, and home invasion passed "constitutional muster" because the trial court "considered the defendant's youth and its attendant characteristics before concluding that his future should be spent in prison." *Lusby*, 2020 IL 124046, ¶ 52. The court noted that *Miller* did not foreclose the possibility of discretionary life sentences for juveniles but instead merely mandated that a court consider the offender's youth and attendant characteristics before imposing such a sentence. *Id.* ¶ 33 (citing *Miller*, 567 U.S. at 483).

¶ 78 Indeed, in their most recent decisions involving the constitutional limitations of juvenile life sentences, both the United States Supreme Court and Illinois Supreme Court have

reiterated that a juvenile offender may receive a life sentence provided procedural safeguards are in place to ensure that the offender's youth is part of the sentencing consideration. See *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1318 (2021) ("The key assumption of both *Miller* and *Montgomery* was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age."); *People v. Dorsey*, 2021 IL 123010, ¶ 40 ("[T]he [*Jones*] [c]ourt found that the eighth amendment allows juvenile offenders to be sentenced to life without parole as long as the sentence is not mandatory and the sentencing court had discretion to consider youth and [its] attendant characteristics."); *People v. Jones*, 2021 IL 126432, ¶ 17 ("As the [United States Supreme] Court recently reaffirmed in *Jones* [citation], although juvenile offenders may not receive mandatory sentences of life-without-parole, they may still be given discretionary life sentences if the appropriate safeguards are in place.").

¶ 79        It is eminently clear that, under Illinois and federal law, a juvenile offender *may* be sentenced in excess of 40 years when the sentencing court considers the offender's youth and its attendant circumstances. Defendant's argument that he could not, under any circumstances, have been sentenced in excess of 40 years is patently wrong and contradicted by the overwhelming weight of authority.

¶ 80        Accordingly, defendant was correctly admonished that the sentencing range for his offenses was 12 to 120 years. Because defendant was correctly admonished, his claim that his guilty plea was not knowing and voluntary fails, and defendant cannot establish that he suffered prejudice.

¶ 81        Because we have rejected defendant's claim on this basis, we need not determine whether he adequately demonstrated cause.

¶ 82                                    3. People v. Jones

¶ 83            After the parties submitted their briefs in this case, the Illinois Supreme Court

issued its opinion in *Jones*, 2021 IL 126432. In *Jones*, a 16-year-old defendant pled guilty in 2000

to first degree murder and was sentenced to 50 years in prison pursuant to a fully-negotiated plea

agreement. *Id.* ¶ 1. Later, the defendant sought leave to file a successive postconviction petition,

arguing that the automatic transfer provisions of the Juvenile Court Act of 1987 (705 ILCS 405/1-

1 *et seq.* (West 2000)) and the truth-in-sentencing provisions, requiring that he serve every day of

his sentence, were unconstitutional pursuant to the principles established in *Miller*, *Graham*, and

*Roper*, which provided special protections for juvenile offenders. *Jones*, 2021 IL 126432, ¶ 7. The

supreme court affirmed the circuit court's denial of leave to file a successive petition. *Id.* ¶ 31.

¶ 84            The defendant in *Jones* raised a similar argument to the one before us—namely,

that

                "when he entered into the plea agreement with the State, he did not anticipate that

                the 50-year prison term stipulated in it would later be declared to be a *de facto* life

                sentence that required the trial court's use of discretion and consideration of his

                youthful characteristics and rehabilitative potential. In making that argument, [the

                defendant] effectively asserts that he did not knowingly and voluntarily enter into

                the plea agreement." *Id.* ¶ 19.

¶ 85            The supreme court rejected that argument, explaining that "[b]y entering a plea

agreement, a defendant 'forecloses any claim of error. "It is well established that a voluntary guilty

plea waives all non-jurisdictional errors or irregularities, *including constitutional ones.*" ' "

(Emphasis in original.) *Id.* ¶ 20 (quoting *People v. Sophanavong*, 2020 IL 124337, ¶ 33, quoting

*People v. Townsell*, 209 Ill. 2d 543, 545 (2004)). The court explained as follows:

"Fundamentally, plea agreements are contracts, and principles of waiver apply equally to them. [Citation.] Entering into a contract is generally 'a bet on the future.' [Citation.] '[A] classic guilty plea permits a defendant to gain a present benefit in return for the risk that he may have to [forgo] future favorable legal developments.' [Citation.]" *Id.* ¶ 21.

¶ 86        The court then discussed the principles underpinning *Dingle v. Stevenson*, 840 F.3d 171, 175 (4th Cir. 2016), and *Brady v. United States*, 397 U.S. 742, 756-58 (1970), in which both defendants unsuccessfully attempted to withdraw their guilty pleas on the basis that they pled guilty to avoid the death penalty but later legal developments made the death penalty an unavailable sentence. *Jones*, 2021 IL 126432, ¶¶ 22-26. The *Brady* court wrote, "[A]bsent misrepresentation or other impermissible conduct by state agents [citation], a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *Brady*, 397 U.S. at 757.

¶ 87        In *Jones*, the Illinois Supreme Court held that the rationale underlying *Dingle* and *Brady* applied equally to the case before it and, because the defendant entered into a guilty plea " 'to avoid a potential, not a certain, sentence,' " his "knowing and voluntary guilty plea waived any constitutional challenge based on subsequent changes in the applicable law." *Jones*, 2021 IL 126432, ¶ 26.

¶ 88        Pursuant to this authority, we conclude that defendant's guilty plea was also intelligently made in light of the then-applicable law. The benefit defendant received was the dismissal of additional counts and a separate armed robbery charge, some of which had the potential to extend his ultimate sentence. Like the defendant in *Jones*, defendant bargained for a benefit, and his knowing and voluntary guilty plea waived any constitutional challenge to that plea

based on subsequent changes in the law.

¶ 89                                  B. Defendant's Challenge to His Sentence

¶ 90          Defendant also argues that the trial court erred by denying him leave to file a successive postconviction claim that his 35-year sentence violates both the proportionate penalties clause and the eighth amendment. Defendant asserts that societal attitudes toward the sentencing of juveniles have shifted in his favor since he was sentenced such that his sentence of 35-years' imprisonment now "shocks the conscience of the community" and constitutes "cruel and unusual punishment." In support of his argument, defendant points to statutory changes regarding the sentencing of juvenile offenders that have been enacted in Illinois and other states since he was sentenced. He argues that he has shown cause because these statutory changes have occurred only recently. Defendant asserts that he has suffered prejudice because his 35-year sentence is longer than "what most juvenile murderers could face today."

¶ 91                                  1. *The Applicable Law*

¶ 92          As earlier discussed (*supra* ¶¶ 63-67), a defendant seeking leave to file a second or subsequent postconviction petition must demonstrate (1) "cause" for failing to raise the error in prior proceedings and (2) "prejudice" resulting from the claimed error. *People v. Orange*, 195 Ill. 2d 437, 449, 749 N.E.2d 932, 939 (2001). "Cause" has been defined as an objective factor that impeded defense counsel's efforts to raise the claim in an earlier proceeding. *Id.* "Prejudice" has been defined as an error which so infected the entire trial that the defendant's conviction violates due process. *Id.*

¶ 93          A defendant requesting leave to file a successive postconviction petition must make a *prima facie* showing of both cause and prejudice. *Bailey*, 2017 IL 121450, ¶ 24. A failure to establish either prong is fatal to the claim. *Howard*, 2021 IL App (2d) 190695, ¶ 21.

¶ 94     The proportionate penalties clause of the Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A statute may be deemed unconstitutionally disproportionate if the punishment for the offense is so wholly disproportionate to the offense as to shock the moral sense of the community. *People v. Miller*, 202 Ill. 2d 328, 338-39, 781 N.E.2d 300, 338 (2002).

¶ 95     In determining whether a sentencing statute, as applied to a particular defendant, is shocking to the moral sense of the community, a court considers evolving societal standards of "elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. Illinois courts have not defined what kind of punishment is "so wholly disproportioned to the offense as to shock the moral sense of the community" because the concept evolves with society. *Id.* Therefore, a court's proportionality review "should be informed by objective factors to the maximum possible extent." (Internal quotation marks omitted.) *Id.* However, the objective evidence is not determinative of the question because " ' "the Constitution contemplates that in the end our own judgment will be brought to bear on the question." ' " *Id.* at 339-340 (quoting *Atkins v. Virginia*, 536 U.S. 304, 312 (2002), quoting *Coker v. Georgia*, 433 U.S. 584, 597 (1977)).

¶ 96     The eighth amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). "The concept of proportionality is central to the Eighth Amendment." *Graham*, 560 U.S. at 59. The prohibition of cruel and unusual punishment is interpreted through society's evolving standards of decency. *Roper v. Simmons*, 543 U.S. 551, 561 (2005).

¶ 97     The proportionate penalties clause provides at least as much, if not greater,

protection than the eighth amendment. *People v. Horta*, 2016 IL App (2d) 140714, ¶ 62, 67 N.E.3d 994. Accordingly, "if [a defendant's sentencing challenge] fails under the proportionate-penalties analysis, we may assume it would not succeed as an eighth-amendment claim either." *Id.*; see also *People v. Coty*, 2020 IL 123972, ¶ 45 ("[I]f a sentence passes muster under the proportionate penalties clause *** then it would seem to comport with the contemporary standards of the eighth amendment ***.").

¶ 98                                    2. *This Case*

¶ 99                                    a. "Cause"

¶ 100          Defendant argues that he has established cause for not bringing his proportionate penalties and eighth amendment claims in an earlier proceeding because the authority upon which his claims rest was not available to him. Specifically, defendant points to legislative changes in Illinois in 2014, 2016, and 2019 that he contends demonstrate a societal shift toward more lenient treatment of juvenile offenders. See Pub. Act 98-61, § 5 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-120 to extend the cutoff date for juvenile jurisdiction from a minor's seventeenth birthday to the minor's eighteenth birthday); Pub. Act 99-69, § 10 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105, which codifies consideration of the *Miller* factors and grants discretion to decline to impose a mandatory firearm enhancement when sentencing a juvenile offender); Pub. Act 100-1182, § 5 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110 (later renumbered as § 5-4.5-115), granting defendants who were under 21 at the time of their offense and sentenced after June 1, 2019, the opportunity to be considered for parole after serving either 10 or 20 years of their sentences). Defendant also points to similar statutes enacted in other states which, he contends, demonstrate that the same societal shift has occurred across the country as well.

¶ 101          Defendant asserts that, when he filed his initial postconviction petition in 2009,

"this evidence [of shifting attitudes toward juvenile sentencing] was not available because it did not exist."

¶ 102    We disagree and conclude that defendant has not demonstrated cause to excuse his failure to bring his proportionate penalties and eighth amendment challenge to his sentence, based upon shifting societal standards, in an earlier proceeding. See *Dorsey*, 2021 IL 123010, ¶ 74 ("Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability *** is insufficient to establish 'cause.' ").

¶ 103    In *People v. Haines*, 2021 IL App (4th) 190612, ¶ 39, this court addressed whether a defendant demonstrated "cause" for not bringing his as-applied, proportionate penalties claim in an earlier proceeding when the authority upon which his claim rested was not yet decided. There, the defendant was sentenced to 55 years' imprisonment for first degree murder committed when he was 18 years old. *Id.* ¶ 1. In 2019, the defendant sought leave to file an as-applied, proportionate penalties challenge to his sentence based upon *Miller* and *Harris*. Specifically, the defendant argued that his sentence did not take into account the fact that his 18-year-old brain was neurologically immature and more closely resembled that of a juvenile than an adult. *Id.* ¶ 12. The defendant argued that he established cause to bring his late claim because *Miller* and *Harris* were not decided and therefore were not available to him when he filed his initial postconviction petition in 2008. *Id.* ¶ 41.

¶ 104    This court held, however, that Illinois has long held that the proportionate penalties clause required the sentencing court to take into account the defendant's "youth" and "mentality." *Id.* ¶¶ 46-47 (citing *Miller*, 202 Ill. 2d 328, 781 N.E.2d 300 (2002); *People v. Sawczenko-Dub*, 345 Ill. App. 3d 522, 532-33, 803 N.E.2d 62, 70-71 (2003); *People v. Maldonado*, 240 Ill. App. 3d

470, 608 N.E.2d 499 (1992); *People v. Center*, 198 Ill. App. 3d 1025, 556 N.E.2d 724 (1990); and *People v. Adams*, 8 Ill. App. 3d 8, 13-14, 288 N.E.2d 724, 728 (1972)). Accordingly, although *Miller* and *Harris* were not decided in 2008, when the *Haines* defendant filed his initial postconviction petition, he had the necessary tools to construct his proportionate penalties challenge based on his youth and brain development. *Id.* ¶¶ 12, 44.

¶ 105　　　　This court acknowledged that *Harris* and *Miller* would have made it easier for the defendant to raise his claim, but "[e]ase of argument is not the standard." *Id.* ¶¶ 41, 45. " '[T]he question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was "available" at all.' " *Id.* ¶ 45 (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)); see also *Dorsey*, 2021 IL 123010, ¶ 74 ("*Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' ").

¶ 106　　　　Similarly, in this case, defendant had the necessary tools to construct an as-applied, proportionate penalties claim when he filed his (1) direct appeal in 2005, (2) initial postconviction petition in 2009, and (3) amended postconviction petition in 2018. The statutory amendments in 2014, 2016, and 2019 would have made it easier for him to prove his claim, but he was not foreclosed from bringing that claim earlier. Accordingly, defendant has not shown cause for his failing to bring his proportionate penalties claim earlier.

¶ 107　　　　Similarly, changes other states have made to their juvenile sentencing laws would have made it easier for defendant to argue his eighth amendment claim, but he has not identified any objective impediment to his ability to bring his claim earlier.

¶ 108　　　　　　　　　　　　b. "Prejudice"

¶ 109　　　　We also conclude that defendant has not shown that he has suffered actual

prejudice. Defendant's 35-year sentence does not shock the moral conscience of the community. Instead, we agree with the trial court that it is defendant's crime that shocks the moral conscience of the community.

¶ 110          Defendant spends considerable effort in his reply brief arguing that the State should be judicially estopped from "insinuating" that defendant participated in the beating of the victim. We note that the trial court explicitly acknowledged when sentencing defendant that there was no evidence that defendant himself beat the victim.

¶ 111          What defendant inarguably did participate in was the planning and commission of the home invasion of a 98-year-old blind and deaf woman who lived alone. Defendant and his friends selected Geldrich—among the most vulnerable in their community—precisely because she was easy prey. They planned to enter her home and steal from her while she was present, increasing the danger and likelihood of violence.

¶ 112          Defendant assisted Lloyd in entering Geldrich's home, which led to the beating that Geldrich endured. Geldrich lived less than a year after the beating and suffered physical and emotional effects that significantly eroded the quality of her remaining life.

¶ 113          We additionally observe that defendant entered the victim's home himself, saw her motionless on the ground, and believed she could be dead. Yet, defendant left her for dead and took no steps to seek help for her. Instead, defendant and Lloyd went to sell her jewelry for drugs. As the trial court noted, defendant was happy to "reap the rewards" in the aftermath.

¶ 114          Even assuming defendant did not beat Geldrich himself, the actions he did commit were correctly described by the court as horrific and barbaric. Defendant received consecutive sentences of 17½ years for attempt (first degree murder) and home invasion, for a total of 35 years. This sentence was near the lower end of the 12-to-120-year sentencing range. Furthermore,

defendant received 15 years less than Lloyd's 50-year sentence. Defendant will be required to serve only 85% of his sentence, which totals 29.75 years. Not only did defendant not receive a *de facto* life sentence, he received significantly *less* than a *de facto* life sentence.

¶ 115    Finally, in fashioning this sentence, the trial court considered the defendant's youth, family background, education, mental health, and drug use. As noted, when affirming defendant's sentence, this court found that the trial court considered defendant's young age, potential for rehabilitation, and relative culpability in fashioning a sentence on the lower end of the sentencing range. *Kuehner*, No. 4-07-0426 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 116    Given the above, we conclude that defendant's sentence (1) is far from wholly disproportionate to his offense and, accordingly, (2) does not shock the moral sense of the community. Because defendant's sentence passes muster under the proportionate penalties clause, it also comports with the eighth amendment. *Horta*, 2016 IL App (2d) 140714, ¶ 62; *Coty*, 2020 IL 123972, ¶ 45.

¶ 117    Last, defendant also argues that he is prejudiced because, "under the law as it exists today, [he] would most likely never even have faced the possibility of adult sentencing, as his case would have fallen under the jurisdiction of the juvenile court." See Pub. Act 98-61, § 5 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-120 to raise the cutoff date for juvenile jurisdiction from a minor's seventeenth birthday to the minor's eighteenth birthday). This argument is too speculative to be of any use, however, because it ignores that, even after the amendment, the State could have petitioned for a transfer to adult court. See 705 ILCS 405/5-805 (West 2004). Given the seriousness of the offense, defendant's age, and his history of delinquency, it is entirely possible that such a petition would have been granted.

¶ 118    Defendant cannot show prejudice because, considering the seriousness of the

offense and defendant's potential for rehabilitation, his sentence neither shocks the moral sense of the community nor constitutes cruel and unusual punishment. Accordingly, the trial court correctly denied him leave to file his successive postconviction petition.

¶ 119        D. Defendant's Citation to Materials Outside of the Record

¶ 120        In support of defendant's argument that his sentence shocks the moral sense of the community and constitutes cruel and unusual punishment because societal attitudes toward the sentencing of juvenile offenders have shifted, defendant's brief contains the following:

>   "[The enactment of 730 ILCS 5/5-4.5-115(b)] means that the majority of serious juvenile offenders will have the opportunity for release by their mid-to-late twenties, an age which corresponds closely with the time at which the now well accepted scientific authority has found that the brain reaches full development. See Ruben C. Gur, *Declaration of Ruben C. Gur, Ph.D., Patterson v. Texas, Petition for Writ of Certiorari to the United States Supreme Court* (2002)."

¶ 121        Defendant provides in a footnote that this document is available in the "Criminal Justice Section Newsletter" at the American Bar Association website.

¶ 122        The State argues that defendant's use of this material is inappropriate because "evidence not presented, and arguments not advanced below, may not be presented on direct appeal." (citing *People v. Nesbitt*, 405 Ill. App. 3d 823, 834 (2010)). The State contends that defendant improperly asserts this material as scientific authority in support of his argument that his sentence is unconstitutionally excessive. The State contends that this material is not helpful to a resolution of this matter because it (1) was never presented to the court below and (2) is " 'expert' testimony masquerading as secondary authority on appeal."

¶ 123        We agree with the State and emphatically reject any consideration of the Gur

declaration when considering defendant's appeal in this case.

¶ 124       In *People v. House*, 2021 IL 125124, ¶¶ 1-3, the supreme court addressed the defendant's argument that his sentence violated the proportionate penalties clause of the Illinois Constitution. The supreme court noted, as it did in *People v. Harris*, 2018 IL 121932, ¶ 40, that no evidentiary hearing was held relating to how the evolving science on juvenile maturity and brain development applied to the specific facts and circumstances of the *House* defendant's case. Because of the absence of any such evidence, the trial court in *House* made no factual findings critical to determining whether the science concerning juvenile maturity and brain development would apply equally to young adults, or to the *House* defendant specifically, as he argued in the appellate court. *House*, 2021 IL 125124, ¶ 29.

¶ 125       Importantly for the present case, the supreme court wrote the following in explanation of its reversal of the appellate court in *House*:

> "[T]he appellate court's opinion equating young adult offenders to juvenile offenders relied on articles from a newspaper and an advocacy group. As the State points out, no trial court has made factual findings concerning the scientific research cited in the articles, the limits of that research, or the competing scientific research, let alone how that research applies to petitioner's characteristics and circumstances." *Id.*

¶ 126       We note that, although three justices of the Illinois Supreme Court concurred in part and dissented in part with the court's opinion in *House*, none of those three justices expressed any disagreement with the above statement.

¶ 127       Even though *House* is only a few months old, any doubt about the supreme court's rejection of the appellate court's use of materials like the Gur declaration was put to rest by the

even more recent decision of the Illinois Supreme Court in *People v. Cline*, 2022 IL 126383. In *Cline*, the defendant challenged the sufficiency of the State's evidence linking the defendant to the crime scene by two fingerprints in light of the methodology employed by the State's fingerprint expert. *Id.* ¶ 32. The First District Appellate Court found that argument persuasive, but the supreme court rejected it and reversed the appellate court. *Id.* ¶¶ 36, 44. The supreme court explained its decision, in part, as follows:

> "[D]efendant did not attempt to show through cross-examination any flaws in [the State's expert witness's] methodology in reaching his conclusion that the two prints matched. *** Instead, defendant is now asking this court to take judicial notice of extra-record materials for the purpose of evaluating the evidence presented at trial. Our review of the sufficiency of the fingerprint evidence in this case, however, must be limited to evidence actually admitted at trial, and judicial notice cannot be used to introduce new evidentiary material not considered by the fact finder during its deliberations. See, *e.g.*, *People v. Barham*, 337 Ill. App. 3d 1121, 1130 (2003).
>
> We recognize the importance of preventing errors based on fingerprint evidence, particularly in a case such as this where there is no other evidence linking defendant to the crime. However, defendant's argument, like the reasoning of the appellate court below, wholly ignores the role of a reviewing court in considering the sufficiency of the evidence. It is not the function of a court of review to retry a defendant [citation], *nor is it permissible for a reviewing court to take judicial notice of material that was not considered by the trier of fact in weighing the credibility of an expert witness's testimony.*" (Emphasis added.) *Id.* ¶ 32-33.

¶ 128     Although we acknowledge that the supreme court in *Cline* was dealing with

weighing the credibility of an expert witness's testimony, we believe its analysis applies fully in other contexts.

¶ 129    One such context recently arose before this court in *In re R.M.*, 2022 IL App (4th) 210426. There, a juvenile defendant raising an ineffective assistance of counsel claim for the first time on direct appeal attempted to supplement the appellate record by attaching an affidavit of his appellate counsel to his appellate brief. *Id.* ¶¶ 19-20. In her affidavit, appellate counsel recounted conversations she had with defendant's trial attorney while preparing defendant's appeal that would support defendant's claim that trial counsel failed to investigate potential impeachment evidence. *Id.* ¶ 20. This court granted the State's motion to strike the affidavit because, as an attachment to the brief, it "[was] not part of the appellate record, and evidentiary matters that are not included in the appellate record cannot be considered by this court on review." *Id.* ¶ 22.

¶ 130    Based upon *Cline*, *House*, and *R.M.*, we conclude it is impermissible for a reviewing court to take judicial notice of material that was not considered by the trial court when a defendant, as here, is challenging the trial court's exercise of discretion.

¶ 131    In further support of this conclusion, we note what the Fifth District Appellate Court said in *People v. Barham*, 337 Ill. App. 3d 1121, 1130, 788 N.E.2d 297, 304 (2003)—the case cited by the supreme court in support of its holding in *Cline*. The Fifth District wrote the following: "A reviewing court will not take judicial notice of critical evidentiary material that was not presented to and not considered by the fact finder during its deliberations. [Citations.] Judicial notice cannot be extended to permit the introduction of new factual evidence not presented to the trial court." *Id.*

¶ 132    The impropriety of defendant's citing to the Gur declaration is exacerbated by the fact that defendant is claiming in this appeal that the trial court abused its discretion by imposing

a 12-year sentence. The exacerbating circumstance is that defendant is asking this court to reverse the trial court's exercise of discretion by considering—at least in part—the Gur declaration that defendant never presented to the trial court at the sentencing hearing. We reject defendant's attempt to do so and reiterate what this court has written in the past about efforts to seek the reversal of a trial court based upon an argument (or purported authority) the trial court never heard:

> "If this court were to reverse (as the dissents suggests) on the basis that plaintiff's proposed amended complaint might be sufficient to state a cause of action, we would be doing so based upon an argument the trial court never heard. Over 15 years ago, in *In re Marriage of Harper*, 191 Ill. App. 3d 245, 246, 547 N.E.2d 574, 575 (1989), this court expressed our great reluctance to make such a ruling, and we are no less reluctant now." *Jackson v. Alverez*, 358 Ill. App. 3d 555, 564, 831 N.E.2d 1159, 1166-67 (2005).

> "We will not reverse the trial court's decision based on an argument the trial court never heard." *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 793, 776 N.E.2d 262, 292 (2002).

> "[Permitting the State to make an argument on appeal that that State never made in the trial court] would result in something that courts of review ought (almost) never do—namely, reverse the trial court based upon an argument it never heard." *People v. Cartmill*, 2013 IL App (4th) 120820-U, ¶ 55 (Steigmann, J., specially concurring).

> "We are exceptionally reluctant to reverse a trial court's decision based on an argument raised on appeal that the trial court never heard below." *People v. Lillard*, 2017 IL App (4th) 150902-U, ¶ 44 (citing *Jackson*, 358 Ill. App. 3d at 564).

"Because [defendant] failed to raise this issue in the trial court, his request that we reverse the trial court based upon this argument would mean that we would be reversing the trial court's decision based upon an argument it never heard." *Dale v. Bennett*, 2021 IL App (4th) 200188, ¶ 44.

¶ 133                                     III. CONCLUSION

¶ 134          For the reasons stated, we affirm the trial court's denial of defendant's motion for leave to file a successive postconviction petition.

¶ 135          Affirmed.

**No. 4-20-0325**

| | |
|---|---|
| **Cite as:** | *People v. Kuehner*, 2022 IL App (4th) 200325 |
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 05-CF-724; the Hon. Ryan M. Cadagin, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Kieran M. Wiberg, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |